And turn to Mac against Rest Cap Borrower, Borrower. David Garber, go ahead. Your Honor, so that please the court, my name is David Garber. I am here on behalf of Mr. and Mrs. Mac. This case arose when the Macs, who were an older couple, bought a house down in Naples, Florida, and they financed it through GMAC mortgage. They maintained their mortgage payments, but in April of 2009, they had some difficulties because they were required to deplete their savings to make their mortgage payments. So they called GMAC and they asked GMAC if they qualified under the federal HAMP program. At the day that they called, GMAC marked their loan down as being in default. They continued negotiations with GMAC for some months, and in the fall of 2009, despite being current in all their payments, not in default at all, GMAC sent their loan into foreclosure, sent it to an attorney. We're familiar with these facts. I think the question is, the first question is about the res judicata effect of the judgment on slander of title and how that's different from the malicious prosecution claim, if it is, that was attempted to be brought here, right? So maybe, isn't that your claim that the judge erroneously applied res judicata? Yes, Your Honor. That is. We have two issues. That's one. And I would characterize that as the lesser of the two issues, but let me get to that one. Well, if you want, I don't care which is the greater. You can construct whichever one you think is the greater. I'm just saying you don't really need to tell us the facts because we've read all the briefs and we're up on that. Tell us why the district court was wrong because you've only got a limited amount of time. Your Honor, the reason that I believe that the court was in error on that point was because res judicata could not lie unless the Macs were in a position to have brought other theories of law against Deutsche Bank at the time that they filed a counterclaim for this foreclosure suit. The law in the state of Florida is that they could not have filed a malicious prosecution against Deutsche Bank at the time they filed their counterclaim because, number one, GMAC was not a party to the lawsuit. It was brought in the name of Deutsche Bank. And information that was later provided by GMAC showed that the relationship between GMAC Mortgage and Deutsche Bank was not as master-servant but was as equals. I don't really understand that. I mean, they brought a counterclaim for slander of title against Deutsche Bank, right? Yes, they did. And that was based on the filing of an inappropriate foreclosure action? Yes, Your Honor. It was. And the malicious prosecution claim, I understand, needs to wait until there's a favorable termination. But there was a favorable termination when Deutsche Bank withdrew its claim. So now why couldn't they have filed the same claim against, the malicious prosecution claim against Deutsche Bank at that point, amended their counterclaim? The action still was going on. It was going on only with respect to the counterclaims. That's correct, Your Honor. But, no, that was not a successful termination. That suit was withdrawn voluntarily by Deutsche Bank. That is not a successful termination. You must have a termination to show that there was some resolution on the merits. And Florida law does not allow a voluntary dismissal to act that way. They were not qualified to bring a claim either against Deutsche Bank or against GMAC until there was a judicial determination. That did not occur until May of 2011. By the time that that happened, I think GMAC went into bankruptcy shortly after that. What happened then that was a favorable termination? A favorable termination? In May. What happened then, the change of 2011? What was the difference that made that a favorable termination at that point? In May of 2011, they went to court and they pursued their counterclaim, and the counterclaim was sustained by the court. They found that the foreclosure was invalid. It should not have been filed, and that at that point there was a judicial termination,  And so what is additional about a malicious prosecution claim that entitles them to any more relief than they got on the slander of title claim? Slander of title is particularly against the value of the real estate. You're not allowed to bring in any general damages, personal injury damages, or anything else. The court heard evidence that because they sold their property under the gun to keep from being foreclosed on, that they actually sold it for about $250,000 less than it was worth. So they got that value. But at the time that the foreclosure suit was going on, Mrs. Mac attempted to commit suicide. Right, so that item of damages is something that could be brought under malicious prosecution but could not be brought under slander of title. Yes, Your Honor, that's correct. So that basically is the gist of our argument with respect to res judicata. Number one, that according to client contract, they had not established a relationship, that is, between GMAC and Deutsche Bank as principal and agent but rather independent contractors. Number two, our argument is that the Macs could not have brought a malicious prosecution case until after they had their trial in May of 2011. Now, our second point, our second point has to do with RESPA. RESPA is a consumer-oriented remedial statute. And after RESPA was instituted, the Macs sent a letter out to GMAC asking for help on their foreclosure, and GMAC did not respond to that. Judge Glynn found against them on that claim. Even though they would have qualified under what's called a qualified written request for making a request for help that was not responded to, they would have qualified for damages under that, which GMAC did not respond to it. But nevertheless, there is what Judge Glynn felt was controlling law, I feel also was controlling law. Two principal cases are the cases of Bernanke v. Citicorp and also Roth v. City Mortgage. Roth v. City Mortgage is a case that came out of this jurisdiction, out of this court. And we are here today, quite frankly, to ask that the court limit the ruling of Roth v. City Mortgage on this grounds. The court there had a case where a lawyer on behalf of the plaintiff had filed several documents he called QWRs, and he had multiple addresses to send them to. But he'd never sent it to the one that his client had been advised to use for QWRs. And the court said, well, if you don't send it to the address that had been given to the plaintiff, then it will not be, it will not trigger the obligations that would happen if it were a valid QWR, and therefore it couldn't be considered. This case is different than that because this case would require my clients who are an elderly couple to know of RESPA, know what a QWR was, intend to send out a QWR, and to go through the myriad of addresses that they had. They had an address for HAMP. They had an address for collections. They had an address for general inquiries. And in a month or two before they filed this, they also had a mortgage statement that came in on the back of it. It gave the new address for QWRs. So it would have required a great deal of sophistication for them to do that. When they sent out their QWR, they didn't label it that. They didn't know what a QWR was. They had no intent to file a QWR. They were just asking for help. Was this issue raised before the bankruptcy court? Yes, Your Honor, it was. It was raised before the bankruptcy court. And the bankruptcy court, in its opinion, and I agreed with it, and I have a hard time even saying anything now, I think Roth is squarely against the MACs. And the MACs cannot win on this issue unless this court modifies its ruling of Roth. And here's the suggestion that I have, that instead of having a bright-line test on a consumer-oriented legislation that you cannot have a QWR if you don't send it to the right address, I want this court, I'm asking this court to change that to say that when a judge or a court considers a QWR case, one of the factors that they must consider as to whether relief should be given would be, did the plaintiff send it to the right address, and if so, why not? I don't think that the decision of Roth was ever intended by Congress to apply to a consumer such as the MACs. And I think if we allow the courts the discretion to fit it to the facts at hand, I think we would have avoided a horrible injustice that Judge Glynn noted in his opinion. And I see I've gone over my time, and I apologize. Thank you very much. We appreciate your argument. Thank you. We reserve two minutes. Mr. Lewis is up. Good morning, Your Honors. May it please the Court? I'm Adam Lewis. I represent the appellee, the Rescott Borrower Claims Trust. Based upon what's just occurred, I want to just make a few comments on the malicious prosecution claim first and then move on to the RESPA claim. The malicious prosecution claim that the appellant has raised today is not the malicious prosecution claim argument that the appellant raised below. The appellant raised below in the trial court. This is Judge Wunder. When below, do you mean in both the bankruptcy court and in the district court, or was not raised in one of those courts? Yeah. The answer is yes and no, Your Honors. Just about to get to that. If the Court will be just a moment patient, I'll sort it out. In the trial court, in the bankruptcy court, the appellant argued that res judicata did not apply to the malicious prosecution claim because it did not meet the four general criteria for res judicata, and Judge Glenn rejected those arguments. In the district court, the appellant raised a different argument that he did not raise below, and that's the argument you just heard just now, that the litigation had not terminated on time for them to have raised it below. Didn't raise the four criteria for res judicata at all. That argument had not been presented to Judge Glenn? Not at all. Judge Caproni rejected that argument and found that termination had occurred, but on top of that, she agreed with us that since the appellant had not raised the argument below in the trial court, the appellant could not raise it in the district court. And now what we have is a third iteration. In this court, if you look at the appellant's brief, the appellant reverts to the four criteria for res judicata in the brief, and that's what the statement of the issues covers. Nothing in the brief raises again this question of timely termination of the litigation in the Florida court, the foreclosure action. And there's case law, although it may be, and we cite it, it says if you don't raise, well, of course, there's case law that says if you don't raise something at trial, you can't raise it on appeal. But there's also two cases from the Supreme Court, somewhat dated, but they're there, saying if you don't raise something on the intermediate appeal, you can't raise it on the next level of appeal. Now, in those cases, we were going from the circuit court of appeals to the Supreme Court. Here we're going from the district court to the circuit court of appeals, but it doesn't matter. The principle is the same. So the first argument here is that this is not an argument that this court should be considering at all, either the one that the appellant just made or the one the appellant made below and briefed in his papers here. It's just too late. You can't keep switching arguments along the way, which has been one of the characteristics of this case. And then, of course, as we detail in our brief, we do meet the standards for res judicata in any case, the standards that the appellant sets out in the brief before this court but then abandons today in our argument. There is a principle. What the appellant does with respect to the standards for res judicata is it interprets those standards narrowly, too narrowly. The basic principle behind res judicata is not to have multiple trials over the same essential set of facts that could have been brought up below to avoid duplicative and unnecessary litigation. Well, that could have been done below. The underlying set of facts for malicious, as I think Judge Lynch, you noted, the underlying set of facts for malicious prosecution, though not identical, the whole underlying picture that gave rise to all of these claims is the same. That's the whole reason for res judicata. And the standards apply. You don't look at which theories were in fact raised. You looked at what theories could have been raised based upon the total nexus of facts that were either discussed. Barbara's argument, and this is why I'm having trouble figuring out why this doesn't fit into the basic issues of res judicata, is whether the malicious prosecution claim actually could have been brought in the same proceeding. Well, two answers, Your Honor. The first is it's an argument that he did not make in a timely fashion. He didn't make that argument in the banquet. And he didn't make it in his brief before this court either, for that matter. You won't find him. And the second answer is, as Judge Caproni found, there was a termination on the merits. What was going on when we withdrew the lawsuit? What was going on was there was some wrestling over fees, but those didn't really have to do with the merits, as Judge Caproni found. When we withdrew the lawsuit, that was on the merits. It meant we couldn't bring it again. Simple as that. And so it would apply even on the opponent's intermittent theory of res judicata. With prejudice as opposed to withdrawn without prejudice. Is that the point? I don't know that it matters, really. But I think that Judge Caproni got it right, if it even matters before this court at this point. Now, on the 2605E, the RESPA claim, first of all, you have to look at the reasons behind the statute and the regulation that implements it. And in this court, Roth says the whole point of the regulation is to enable a servicer to deal timely with inquiries on a tight time schedule. It's the whole point. And, of course, as we point out, that also serves the interest of the borrower because it helps to assure that the borrower is going to get a timely answer. Because there's these deadlines that can have serious consequences for the servicer. For this court, to adopt the exception that the appellant argues for would be to gut the regulation. What servicer in his right mind would get a letter and say, oh, well, I don't need to bother looking into whether this guy is sophisticated or not. I don't know much about him. I don't know if he's sophisticated. No servicer is going to take the risk that he's going to be wrong. The whole point of having a specific address is, whether the letter that comes to that specific address is a QWR, it alerts the servicer to treat it like one, at least initially, so that it can acknowledge the receipt on time and so that it can respond on time if it is a QWR. All of that goes by the wayside if you adopt the appellant's suggestion. No case has done that. If you look at the cases that have followed Roth and Bernanke, a number of them have involved unsophisticated borrowers, although they don't discuss the issue one way or the other. No case discusses that issue one way or the other. Then finally, Your Honors, I think one more point about the RESPA claim is, as we argue in the brief, the appellant raised that in the Florida court as a way of trying to avoid the granting of relief on the motion to vacate or to amend the judgment brought by Deutsche Bank. When he saw he was going to lose that, he threw in the RESPA claim, this RESPA claim, because the court was about to throw out a different RESPA claim, and the court in Florida didn't adopt that theory. It was tried there. It's race judicata right on its face. Then finally, whatever else may have happened in this case, the appellant has failed to show damages. Certainly traced no damages specifically to the QWR. The only report from the hospital is there are a number of reasons that Mrs. Mack tried to commit suicide, one of them being the foreclosure action, but this case on the RESPA claim is not about the foreclosure action. It's about the failure to respond to the letter. Appellant keeps trying to... The failure to respond to the letter was not consummated until after the tragic events involving Mrs. Mack. In other words, they still had time to respond at that time. Well, she tried to commit suicide just days after the letter was mailed from Florida to Iowa. Probably hadn't even arrived when she tried to commit suicide. How could she have tried to commit suicide in response to the failure to respond? I don't see that causal connection. Thanks, Mr. Lewis. Thank you, Your Honours. I appreciate the time. Mr. Garber, you've reserved two minutes. Yes, Your Honour. I'd like to make my points very quickly. Number one, I've heard many times that the plaintiff has failed to bring up the malicious prosecution issue, and I refer the court to page 25 of my brief where I say that Florida law requires a bona fide termination, and an example of that is a second voluntary dismissal. It was brought up there. It was brought up also in the bankruptcy court when I told the bankruptcy court that in order for there to be res judicata, all four elements of malicious prosecution had to be met. I didn't go into a lot of detail, but I did bring up that. With respect to the address issue, I think it's important to know here that in both the Bernanke case and in both the Roth case, the plaintiffs sent their letters all over the country but never got to the city and state that was designated. In our case, Waterloo, Iowa, was where the MACs were sending all of their communications, and the only difference between the Waterloo address that they had been using since they began their loan and the one that maybe one month before they sent out their QWR was that they changed the P.O. box. That was the only difference. Why that should matter. If the QWR address is in Cleveland instead of in Waterloo, it also still goes to the same company, and one might think the company ought to pay attention to something like this in that event. But the point of the Roth case is it has to go to the place where the QWRs go, and if that's a special post office box or a special city or an address in Estonia, the point is it has to go there because that's what alerts the company that this is to be treated as a QWR. So I don't understand why it matters that this address is in the same city or not. It's still not the right address that alerts the company that this is what we're supposed to do with it. And, Your Honor, looking at it from the point of view of GMAC, I understand that entirely. Looking at that in view of people who are just trying to contact their company, they're going to the same city and state. I get that, but I don't see why that makes a difference as to whether it's Waterloo or Pittsburgh. The point... You could make the exact same argument and would have the exact same consumer appeal that looked at from the vantage point of the consumer. They're used to sending their correspondence to an address in New York. Now they send a letter to that address, but because somewhere in the fine print it says you should send a QWR, which they don't even know this is, to Waterloo, they're screwed. But I don't see why it makes a difference that it's a difference between New York and Waterloo rather than between an address on 55th Street in New York and 50th Street or between Post Office Box A and Post Office Box B. It's still a different address. I understand your point, and I don't take issue with that point, Your Honor. And the final thing that I want to... What you really want us to do is to go and bank and overrule Roth and create a totality of the circumstances test instead. Yes, Your Honor, that's what I'm asking. Thank you, Mr. Garber. Thank you. We'll reserve the decision.